|  |  |
|---|---|
| UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF NEW YORK<br>- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x<br>UNITED STATES OF AMERICA<br><br>            - against -<br><br>SILVANO CICUTO, ROBERT CICUTO and<br>LUCIANO MANNU<br><br>                                        Defendants.<br>- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x | USDC SDNY<br>DOCUMENT<br>ELECTRONICALLY FILED<br>DOC #: _____<br>DATE FILED: August 6, 2010<br><br>10 Cr. 138 (PAC)<br><br>MEMORANDUM<br>OPINION & ORDER |

HONORABLE PAUL A. CROTTY, United States District Judge:

Defendants Silvano Cicuto ("Cicuto"), Robert Cicuto ("Robert") and Luciano Mannu ("Mannu") are charged with one count of conspiracy to import ecstasy and 1-benzylpiperazine in violation of 21 U.S.C. §§ 952(a), 812, 960(b)(3), and one count of conspiracy to possess ecstasy and 1-benzylpiperazine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1), 812, 841(b)(1)(c).[1]  The Indictment alleges that Defendants and others conspired to import ecstasy pills from Canada for sale in the United States and that Defendants committed overt acts in furtherance of the conspiracy in the Southern District of New York.

On January 21, 2010, after months of investigation, agents of the Drug Enforcement Administration ("DEA") learned that Cicuto and Mannu were staying in a hotel room at the Ramada Plaza in Newark, New Jersey.  The hotel room was registered in Cicuto's name only and an invoice for the room indicates a single guest.  On January 22, 2010, DEA agents arrested Cicuto shortly after he left the hotel room.  The agents then knocked on the hotel room door and Mannu answered.  After arresting Mannu, the

---

[1] 1-benzylpiperazine is a controlled substance with characteristics similar to that of ecstasy.

1

agents conducted a protective sweep of the room.  During the sweep, the agents noticed handwritten notes and a hotel bill sitting on a desk and on a bedside table.  Following the protective sweep, Mannu signed a written consent to search the hotel room and the agents seized the notes and hotel bill.

Cicuto moves to suppress the notes and hotel bill as the products of a warrantless search in violation of the Fourth Amendment.  If suppression is not granted, Cicuto asks the Court to hold an evidentiary hearing to determine whether the evidence is admissible.  Cicuto contends that because the hotel room was registered in his name, Mannu did not have actual or apparent authority to consent to the search.  In opposition, the Government argues that regardless of whether the room was registered in Cicuto's name, Mannu had actual authority to consent to the search.  Even if Mannu did not have actual authority to consent to the search, the Government contends that he had apparent authority.  Finally, even if Mannu did not have actual or apparent authority to consent to the search, the Government maintains that the seizure was authorized under the plain view exception to the Fourth Amendment's warrant requirement.

To be entitled to an evidentiary hearing on a motion to suppress, the defendant "bears the burden of showing the existence of disputed issues of material fact." United States v. RW Prof.'l Leasing Servs. Corp., 317 F. Supp. 2d 167, 172 (E.D.N.Y. 2004).  To carry this burden, the "defendant must submit sworn factual allegations from an affiant with personal knowledge." United States v. Fruchter, 104 F. Supp. 2d 289, 308 (S.D.N.Y. 2000).  Cicuto fails to show a single disputed issue of fact necessitating an evidentiary hearing.  Indeed, Cicuto does not expressly challenge the Government's recitation of the facts; instead, his counsel simply asserts that the Government must prove the proffered facts at an evidentiary hearing.  This argument is the precise opposite of the

2

relevant legal requirement. It is Cicuto's burden to show that there are disputed questions of fact; it is not the Government's obligation to prove its unchallenged factual assertions on Cicuto's say-so. Besides, Cicuto has not submitted an affidavit in support of his motion based on personal knowledge. He prefers to rely on his attorney's sworn statement, but the attorney has no personal knowledge of the facts surrounding the DEA agents' seizure of the notes and hotel bill. Finally, Cicuto's attorney's affidavit does not challenge the facts as recited by the Government; it simply recounts otherwise undisputed facts.

Based on the unchallenged facts, the seizure of the notes and hotel bill was proper. Mannu consented to the search of the hotel room, and since he was staying with Cicuto in the room, he had actual authority to do so. Even if Mannu did not have actual authority to consent to the search, it was more than reasonable for the DEA agents to believe that Mannu had the authority to consent, and so he had apparent authority. Since Mannu was authorized to consent to a search of the hotel room, the Court does not reach the Government's plain view argument. Cicuto's motion to suppress and for an evidentiary hearing is DENIED.

**I. Facts**[2]

In June, 2009, the DEA began an investigation into a Canadian ecstasy smuggling ring based on a tip from a confidential informant. (Government's Memorandum in Opposition ("Mem. in Opp.") at 2; Defendant's Memorandum in Support ("Mem. in Supp.") at 1-2.) Over the following eight months, an undercover DEA agent communicated with various alleged co-conspirators, including Cicuto and his son Robert. (Mem. in Supp. at 2-3; Mem. in Opp. at 2-6.) Throughout this time, the undercover

---

[2] The facts are taken from the parties' motion papers and from the affidavit of Cicuto's attorney.

posed as a friend of the informant interested in purchasing large amounts of ecstasy pills. (Mem. in Supp. at 2-3; Mem. in Opp. at 2-6.)

In July and August, 2009, the undercover worked out a deal to purchase 100,000 ecstasy pills from Cicuto and his associate in Canada. (Mem. in Opp. at 3.) The drugs were shipped in late August, 2009, and when the drug courier attempted to cross the border from Canada into Minnesota, he was arrested. (Id.) Upon arresting the courier, law enforcement agents discovered and seized 100,000 pills containing 30 kilograms of 1-benzylpiperazine. (Id. at 4.)

Shortly after the 100,000 pill seizure, Cicuto and Robert agreed to deliver a large quantity of ecstasy pills to the undercover in New York City. (Mem. in Opp. at 4-5; Mem. in Supp. at 3.) In mid-October, 2009, the undercover worked out the logistics of the deal with Robert and other alleged co-conspirators. (Mem. in Opp. at 4-5.) The undercover sent one of the co-conspirators an email stating that he would meet the "guys" at an address in the Chelsea neighborhood of Manhattan. (Id. at 5.) The drugs were shipped, and on October 29, 2009, DEA agents arrested two men with 150,000 ecstasy pills at the address the undercover had provided. (Id.)

After DEA agents arrested the two men and seized the 150,000 ecstasy pills, the undercover called Robert and said that the transaction had gone as planned. (Mem. in Supp. at 3.) On November 2, 2009, Cicuto sent the undercover a text message telling him to wire payment for the ecstasy pills to an address in British Columbia, Canada. (Mem. in Opp. at 6.) But the undercover did not wire the money, and over the following two months, he received numerous text messages and voicemails pressing him for payment. (Id.; Mem. in Supp. at 3.)

The drugs still unpaid for, Cicuto and Mannu entered the United States on January 20, 2010. (Mem. in Supp. at 3.) On the same date, Cicuto rented room 233 ("Room 233") at the Ramada Plaza in Newark, New Jersey. (Affidavit of Stephanie Carvlin ("Carvlin Aff.") ¶ 6; Ramada Invoice, Carvlin Aff., Ex. A.) The invoice for Room 233 lists "Silvano Cicuto" under the heading "Guest Information" and next to "Number of Guests" only one guest is indicated. (Ramada Invoice, Carvlin Aff., Ex. A.) The invoice, however, also shows that Room 233 had "Double Beds." (Id.)

On January 21, 2010, Mannu called the informant and said that he had come to the United States to meet with the informant and the undercover to discuss payment for the 150,000 ecstasy pills. (Mem. in Opp. at 6.) Mannu told the informant that he was staying at the Ramada near the Newark International Airport and gave the informant his phone number and room extension at the hotel. (Id.) The informant then passed Mannu's hotel and room information on to the undercover. (Id.) The undercover, in turn, called the phone number Mannu had given to the informant and Mannu answered the phone. (Id.) Mannu told the undercover that, "[y]ou received some goods . . . and we in Vancouver got fucked." (Id.) The undercover, who was unaware that Cicuto was with Mannu, asked Mannu whether he was in Newark on behalf of Cicuto. (Id.) Mannu said that he was and asked the undercover whether they could discuss payment for the ecstasy pills. (Id.) After the undercover said that he wanted to hear from Cicuto, Mannu indicated that Cicuto was with him. (Id. at 7.) Cicuto then got on the phone and said that he "was upset." (Id.) The undercover and Cicuto agreed to meet at the Ramada hotel the next morning to discuss payment for the ecstasy pills. (Id.; Mem. in Supp. at 3.)

The undercover and other DEA agents went to the Ramada the following morning and established surveillance of Room 233. (Mem. in Opp. at 7; Mem. in Supp. at 3.)

When the undercover called Room 233, Mannu answered the phone and said that Cicuto was in the room with him. (Mem. in Opp. at 7.) After an agent saw Cicuto leave Room 233 and walk towards the elevators, he was arrested. (Id.; Carvlin Aff. ¶ 8.) When other agents knocked on the door to Room 233, Mannu answered. (Mem. in Supp. at 7.) The agents placed Mannu under arrest, conducted a security sweep of the room, and found that Mannu was alone. (Id.; Carvlin Aff. ¶ 9.)

During the protective sweep, an agent observed approximately four pages of handwritten notes on Ramada stationary and a hotel bill for Room 233 lying on a desk near the television. (Mem. in Supp. at 7-8.) Another agent observed approximately three pages of handwritten notes on loose-leaf paper sitting on a table between the two beds in Room 233. (Id. at 8.) The notes contain the number "100,000" and a date within the timeframe of the first interdicted shipment of ecstasy pills. (Id. at 7.) The notes also contain the undercover's and the informant's names and contact information, as well as the names, phone numbers, and addresses of the informant's "boyfriend" and "relatives." (Id. at 7-8.)

The agents did not, however, immediately seize the notes and hotel bill. Instead, Mannu was presented with, and signed, a written consent to search Room 233. (Id.; Consent to Search; Carvlin Aff., Ex. B; Carvlin Aff. ¶ 10.) The agents then seized the notes and hotel bill, a cellphone and a laptop computer. (Mem. in Supp. at 4; Mem. in Opp. at 4; Carvlin Aff. ¶ 12.) In addition to the items seized, the agents observed two suitcases and a backpack in Room 233. (Mem. in Opp. at 8.) Mannu told the agents that the cellphone, laptop computer, one of the suitcases and the backpack were his, and that the other suitcase belonged to Cicuto. (Id.)

**III. Cicuto is Not Entitled to an Evidentiary Hearing**

An evidentiary hearing is not required on a motion to suppress unless there is a factual dispute. See United States v. Pena, 961 F.2d 333, 339 (2d Cir. 1992). The burden of showing the existence of a factual dispute is on the defendant. See United States v. Rush, 352 F. Supp. 2d 383, 386 (E.D.N.Y. 2005) (citing Pena, 961 F.2d at 338). To create a factual dispute, the "defendant must submit sworn factual allegations from an affiant with personal knowledge." Fruchter, 104 F. Supp. 2d at 308 (quoting United States v. Urena-Pere, No. 91 Cr. 946, 1992 WL 17977, at *1 (S.D.N.Y. Jan. 24, 1992)). This Court has explained:

> Experience shows that unless such serious charges are initiated upon the sworn statement of persons having personal knowledge of the facts, a great deal of time of the parties and the Court is frequently wasted upon unnecessary, expensive and protracted suppression hearings, all for the reason that the attorney demanding suppression merely upon his own say-so often discovers only at the hearing that he has been misled by unsworn representations of his clients, which they would be unwilling to swear in an affidavit, particularly if they were questioned closely by their counsel and warned of the consequences of perjury.

United States v. Garcia, 272 F. Supp. 286, 290 (S.D.N.Y. 1967).

Cicuto does not dispute any of the relevant facts set forth in the Government's memorandum in opposition. (Mem. in Supp. at 1-7; Cicuto's Reply to Mem. in Opp. ("Reply Mem.") at 1-5; Carvlin Aff. ¶¶ 1-12.) He does not challenge the Government's assertions that Mannu was staying with him in Room 233; that Mannu's belongings were in Room 233; that Mannu answered the phone in Room 233 the night before and the morning of the search; or that the notes and hotel bill were sitting out in Room 233 when the DEA agents conducted a protective sweep. (Id.) Instead, Cicuto argues that the Government has failed to prove these facts, and that the Government's arguments based on the consent and plain view exceptions to the warrant requirement "must be rejected

7

and suppression ordered because the government has failed to make a *prima facie* showing via affidavit or otherwise that the precondition for invocation of these exceptions to the warrant requirement are met in this case." (Reply Mem. at 3.) Cicuto goes so far as to argue that "by failing to submit affidavits without one who has personal knowledge of the events, the government has not created a factual dispute sufficient to defeat Cicuto's motion for suppression." (Reply Mem. at 5.)

      Cicuto has things completely backwards. It is *his* burden to show the existence of a factual dispute. See Rush, 352 F. Supp. 2d 386. And it is *his* burden to submit an affidavit based on personal knowledge evidencing such a dispute. See Fruchter, 104 F. Supp. 2d at 308. Not only has Cicuto failed to challenge the Government's recitation of the facts in his moving papers, but his attorney's affidavit is wholly insufficient to raise disputed issues of fact. First, the affidavit simply recites undisputed facts. (Carvlin Aff. ¶¶ 6-12.)[3] Second, "[c]ourts have made clear that attorney affidavits are insufficient to warrant a [suppression] hearing." United States v. Shaw, 260 F. Supp. 2d 567, 570 (E.D.N.Y. 2003) (collecting cases). Indeed, when "[d]efendants' attorney submitted his own conclusory affidavit [in support of a motion to suppress] alleging that there were various illegal searches," Garcia, 272 F. Supp. at 290, this Court reproached counsel for "evidenc[ing] a lack of appreciation for his responsibilities as an officer of th[e] Court." Id. Since Cicuto has failed to challenge the Government's description of the facts through an affidavit based on personal knowledge – or, for that matter, through his motion papers – his request for an evidentiary hearing is denied.

---

[3] It is worth pointing out that the facts set forth in the attorney's affidavit are based on the attorney's review of the discovery and "where specifically noted, on information provided by Mr. Cicuto." (Carvlin Aff. ¶ 5). The affidavit, however, never "specifically note[s]" any "information provided by Mr. Cicuto." (Id. ¶¶ 1-12). In other words, Cicuto has not submitted an affidavit setting forth his version of the facts which contradict the Government's assertions.

**IV. Mannu Had Actual or Apparent Authority to Consent**

"Warrantless searches 'are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well delineated exceptions.'" United States v. Howard, 489 F.3d 484, 492 (2d Cir. 2007) (quoting Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971)).  One "well delineated" exception applies "when the search is conducted pursuant to the consent of an authorized person." United States v. Snype, 441 F.3d 119, 130 (2d Cir. 2006).  It has been long settled "that a third party may validly consent to the search of an area in which another has a reasonable expectation of privacy where the third party shares common authority over the area." United States v. Davis, 967 F.2d 84, 86-87 (2d Cir. 1992) (citing United States v. Matlock, 415 U.S. 164, 171 (1974)).

A third party's "'common authority' is not synonymous with a technical property interest." Georgia v. Randolph, 547 U.S. 103, 110 (2006).  As explained by the Supreme Court in Matlock,

> [t]he authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

415 U.S. at 171 n.7 (internal citations omitted).  The Second Circuit has "refined the Matlock rule," Moore v. Andreno, 505 F.3d 203, 208 (2d Cir. 2007), and held "that a third-party consent to a search will validate the search if two prongs are present: first, the third party had access to the area searched, and second, either: (a) common authority over the area; or (b) a substantial interest in the area; or (c) permission to gain access." Davis, 967 F.2d at 87.

Even if a third party "lacks actual authority to consent to a search of a particular area, he still may have apparent authority to consent to the search." Moore, 505 F.3d at 209. Illinois v. Rodriguez teaches that apparent authority to give consent "must be judged against an objective standard: would the facts available to the officer at the moment . . . 'warrant a man of reasonable caution in the belief' that the consenting party had authority over the premises?" 497 U.S. 177, 188 (1990) (some internal quotation marks omitted) (quoting Terry v. Ohio, 392 U.S. 1, 21-22 (1968)). Thus, even if the person giving consent in fact lacked authority to do so, the consent is still valid if the person had apparent authority to consent, i.e., "the person reasonably appeared to the police to possess authority to consent to the search." United States v. McGee, 564 F.3d 136, 139 (2d Cir. 2009).

Based on the Government's undisputed recitation of the facts, Mannu called the informant a day before the search, said that he was staying at the Ramada near Newark Airport, and provided the informant with his room extension. Later in the day, the undercover called Room 233 at the Ramada and Mannu answered the phone. The undercover said he wanted to hear from Cicuto; Mannu indicated that Cicuto was with him, put Cicuto on the phone, and Cicuto and the undercover spoke. When the undercover called Room 233 on the morning of the search, Mannu once again answered the phone. After Cicuto was arrested leaving Room 233, Mannu was found alone in the room. Room 233 had double beds and Mannu's luggage, cellphone and laptop were in the room. In light of these unchallenged facts, Cicuto is left to argue that Mannu did not have actual authority to consent to the search because Room 233 was registered in Cicuto's name and the hotel invoice only showed one registered guest. (Mem. in Supp. at 6.)

But since a third party's authority to consent to a search does not turn on "technical property interest[s]," Randolph, 547 U.S. at 110, whether or not Mannu was registered with the hotel as a guest staying in Room 233 is nearly irrelevant. Indeed, other courts have recognized the authority of third-parties sharing hotel rooms to consent to a search of the room even if the room is not registered in their name. See United States v. Kimoana, 338 F.3d 1215, 1222 (10th Cir. 2004) ("Although Defendant was not the registered guest who had paid for the room, he had stayed there overnight, left his possessions there, and carried a key to the room. This supports a finding that Defendant had joint access or control over the room, and thus had actual authority to consent."); United States v. Clark, 234 F. Supp. 2d 471, 476-77 (D. N.J. 2002) (third-party had actual authority to consent to search of hotel room where he stayed overnight despite not being a registered guest). Mannu was clearly an occupant of Room 233 with "access to the area searched" and "common authority over the area." Davis, 967 F.2d at 87. As such, he had actual authority to consent to the search. Id. In light of Mannu's authority to consent to the DEA agents' search of the hotel room, Cicuto ran the risk that "a guest obnoxious to . . . [him] would be admitted in his absence," Randolph, 547 U.S. at 11, and the search of Room 233 did not violate the Fourth Amendment.

Even if Mannu did not have actual authority, it was objectively reasonable for the DEA agents to believe that he had the authority to consent to a search of Room 233, and so he had apparent authority. Rodriguez, 497 U.S. at 188. Mannu "reasonably appeared to . . . [the DEA agents] to possess authority to consent to the search," McGee, 564 F.3d at 139, because he told the informant he was staying at the Ramada; provided the informant with the hotel phone number and room extension; answered the phone in Room 233 both the day before and morning of the search; and was alone in Room 233

when the agents knocked on the door after arresting Cicuto.[4] Since Mannu had apparent authority to consent to the search of Room 233, his consent and the search were valid.

## Conclusion

For the foregoing reasons, Cicuto's motion to suppress and for an evidentiary hearing is DENIED. The oral argument scheduled for 2:00 p.m. on August 10, 2010 is CANCELED. A status conference will be held at 2:30 p.m. on August 17, 2010 in Courtroom 20-C. At the status conference, the parties should be prepared to discuss any further motions and to set a date for trial. It is further ORDERED that pursuant to 18 U.S.C. 3161 (h) (8) (A), the time from August 6, 2010 through August 17, 2010 is excluded in the interest of justice. The Court finds that this exclusion outweighs the best interest of the Defendants and the public in a speedy trial.

Dated: New York, New York
August 6, 2010

SO ORDERED

*[signature]*

PAUL A. CROTTY
United States District Judge

---

[4] The Government adds the fact Mannu had his luggage and other belongings in the room to the list of reasons why it was reasonable for the agents to believe that he had authority to consent to the search. (Mem. in Opp. at 16). While it is not entirely clear when the agents learned that some of the items in the room were Mannu's, it appears that Mannu did not claim ownership over the luggage, cellphone and laptop until after he consented to the search. (Id. at 8). Since the reasonableness of a law enforcement agent's belief that a person has authority to consent to a search is judged "at the moment" the person purports to consent, Rodriguez, 497 U.S. at 188, the Court does not rely on the fact that Mannu's belongings were in the room in concluding that he had apparent authority to consent to the search.